[Cite as *R.A.R. v. C.E.R.*, 2023-Ohio-232.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| R.A.R. | : | JUDGES: |
| | : | |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| Plaintiff-Appellant | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 2022 CA 00011 |
| | : | |
| C.E.R. | : | |
| | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Licking County Court of
Common Pleas, Domestic Relations
Division, Case No. 2019 DR 01039 DF

JUDGMENT:     AFFIRMED IN PART; REVERSED AND
REMANDED IN PART

DATE OF JUDGMENT ENTRY:     January 26, 2023

APPEARANCES:

For Plaintiff-Appellant:                    For Defendant-Appellee:

ERIC M. BROWN                          MELINDA G. SEEDS
250 Civic Center Dr., Suite 220         195 East Broad St.
Columbus, OH 43215                     P.O. Box 958
                                        Pataskala, OH 43062

*Delaney, J.*

{¶1} Plaintiff-Appellant R.A.R. appeals the February 8, 2022 judgment entry of the Licking County Court of Common Pleas, Domestic Relations Division.

## FACTS AND PROCEDURAL HISTORY

### Decree of Shared Parenting

{¶2} Plaintiff-Appellant R.A.R. ("Father") and Defendant-Appellee C.A.R. ("Mother") were married on October 16, 2010. They have two children as issue of the marriage: P.R., born in November 2012, and M.R., born in October 2015.

{¶3} The parties filed a petition for dissolution of marriage on September 30, 2019. The petition for dissolution of marriage included a separation agreement and a shared parenting plan.

{¶4} The Licking County Court of Common Pleas, Domestic Relations Division, issued a Decree of Dissolution of Marriage on November 18, 2019. The trial court also issued a Decree of Shared Parenting on November 18, 2019. Both parents were designated the legal custodians and residential parents of the children. Mother was named the child support obligor and ordered to pay $1,130.72 per month in child support to Father.

{¶5} Mother and Father also entered into an Agreed Judgment Entry appointing Charlotte Parsons to serve as the Parenting Coordinator for the minor children and the parties. The Parenting Coordinator was appointed for a term of one year, ending on October 23, 2020, unless agreed otherwise by the parties. The duties of the Parenting Coordinator included assisting the parties to resolve disputes related to the Court Order

by consulting outside sources and issuing a written decision. Mother and Father were equally responsible for the Parenting Coordinator's fees.

**Mother's Motion for Reallocation of Parental Rights and Responsibilities**

{¶6} On December 22, 2020, Mother filed a Motion to Reallocate Parental Rights and Responsibilities. Her motion stated that she moved the trial court "to modify the current orders in this case regarding the minor children * * *, and reallocate the parental rights and responsibilities by terminating the current shared parenting plan and naming the mother as the residential parent with sole legal custody of the minor children or in the alternative, by modifying the current shared parenting plan and by addressing child support, parenting time, health insurance, tax dependency issues, in such a way as to ensure the best interests of the children." Mother alleged in her motion that Father was no longer cooperating or communicating with her in regard to the care of the children, so that the shared parenting plan was not providing for the best interests of the children. Mother noted that Father's failure to abide by the shared parenting plan was especially problematic due to P.R.'s health needs, which included a diagnosis of ADHD.

{¶7} Mother also filed a motion for temporary orders. In the motion, she requested an order that the parties to follow the directions of P.R.'s medical providers for his ADHD treatment plan that included medication. Mother also requested the parenting time schedule be changed to a 2-2-3 schedule.

{¶8} Father responded in contra to the motions for reallocation and temporary orders. He also moved to appoint a Guardian ad Litem for the children.

{¶9} The trial court appointed a GAL on January 28, 2021. The trial court denied Mother's motion for temporary orders but ordered the parties to complete one mediation session and the GAL to complete an interim report on P.R.'s ADHD treatment plan.

{¶10} Father filed a proposed shared parenting plan on March 10, 2021.

{¶11} Mother filed a motion for ex-parte temporary orders, which the trial court denied on April 21, 2021. The court set the matter for an expedited hearing. After a pre-trial, the parties entered into a settlement of all temporary issues before the trial court. On May 26, 2021, the trial court filed an Agreed Magistrate's Order that found the parties would continue under the November 18, 2019 shared parenting plan, with modifications in parenting time outlined in the agreed order. The parties would conduct all communication regarding shared parenting matters through the Our Family Wizard program.

**Hearing**

{¶12} Mother's motion for reallocation of parental rights came on for hearing before the magistrate on July 12, 2021 and July 29, 2021. At the start of the hearing, the magistrate asked Mother's counsel, "what specifically is it that you're asking the Court to do today?" (T. 5). Mother's counsel responded, "Your Honor, my client is requesting that this Court terminate the shared parenting plan that's been in place since November 18th of 2019." (T. 7). Father's counsel stated Father did not believe the shared parenting plan should be terminated because there was no change in circumstances and the Mother's requested modifications were not in the best interests of the children.

### ADHD Diagnosis

{¶13} Charlotte Parsons, the parties' Parenting Coordinator, testified that she was assigned by court order to help Mother and Father negotiate and implement the shared parenting plan. The parties signed the contract on December 11, 2019. During her tenure as the parties' parenting coordinator, Parsons noted Mother and Father's main source of conflict was P.R. and his diagnosis of ADHD.

{¶14} Parsons recollected that issues between Mother and Father started in March 2020, at the start of the COVID pandemic. Parsons recommended Mother and Father utilize the Our Family Wizard ("OFW") program for communication, so that there was transparency. Parsons was able to view the parties' communications on the online program.

{¶15} P.R. experienced developmental delays as a toddler. In November 2019, when P.R. was in first grade, he received an IEP for learning difficulties. His services included summer services for reading and writing. He also received counseling from Dr. Peterson, who recommended further evaluation to determine if P.R. had other diagnostic considerations that could explain P.R.'s school struggles and other behaviors.

{¶16} In March 2020, when the schools switched to virtual learning due to the COVID pandemic, P.R. struggled with the different learning modality.

{¶17} In August 2020, Mother communicated with Father through OFW, expressing that P.R. should be evaluated to determine if he needed further services, based on the counselor's and other professional recommendations. She contacted Nationwide Children's Hospital, which recommended Dr. Michelle Spader to conduct an evaluation of P.R. Father responded to Mother that he disagreed with her on all accounts

and would not approve of any further doctor visits. He felt that P.R.'s difficulties were due to Mother's parenting style.

{¶18} Mother had P.R. evaluated by Dr. Michelle Spader on August 18, 2020. Father did not participate in the August 2020 evaluation. Dr. Spader diagnosed P.R. with ADHD. Father reiterated through OFW that he did not approve of P.R.'s evaluation.

{¶19} P.R.'s second grade teachers recommended that P.R. receive further evaluations for learning difficulties. P.R.'s teachers also noticed him exhibiting behaviors they felt required further evaluation. Based on the recommendations, Mother scheduled a follow-up assessment with Dr. Spader on September 14, 2020. Father objected to the assessment. He wanted to give P.R.'s teachers more time in the new school year to work with P.R. He also felt that P.R.'s behaviors could be managed through better parenting by Mother. Mother agreed to move P.R.'s assessment with Dr. Spader to October 20, 2020 to allow Father to consult with P.R.'s counselor, teachers, and specialists. Mother requested P.R.'s evaluation be completed before P.R.'s IEP meeting in November 2020, so the IEP could include any new services. Father continued to object to the evaluation, at which point Parsons stated she would be required to investigate and issue a parenting coordinator decision as to whether P.R. should receive a second evaluation. Parsons independently consulted with P.R.'s teachers, specialists, and counselors and agreed that they all recommended that P.R. receive further evaluation. Mother and Father were responsible for the fees incurred by Parson's investigation.

{¶20} Father responded to Parson's recommendation that an evaluation was necessary with an OFW communication stating, "[T]his is a formal complaint." He went on to state that he wanted to stop the parenting coordinator process to avoid more fees

from accruing. Parsons agreed to terminate the parenting coordinator contract a few weeks earlier than the termination date because she felt the parties' money could be used on attorneys' fees, not her fees. On October 6, 2020, Father stated through OFW that Mother could proceed with P.R.'s assessment.

{¶21} Dr. Spader conducted P.R.'s second assessment on October 20, 2020, where she diagnosed P.R. with ADHD. Dr. Spader recommended a combined behavioral management/skill building plus medication approach.

{¶22} In November, Father texted with Mother and stated he was not going to medicate P.R. for ADHD. He stated that maybe Mother should be evaluated and medicated. Mother took P.R. to the pediatrician in December 2020. Mother emailed Father that the pediatrician recommended an ADHD medication. Father responded by email that he would not approve of any treatment or medication for P.R. without first exploring other alternatives.

{¶23} Mother filed the motion for reallocation of parental rights and responsibilities in December 2020.

{¶24} In April 2021, Father obtained a second opinion for P.R., which confirmed the diagnosis of ADHD. Mother located a behavioral therapist who specialized in ADHD for P.R. The therapist was recommended by Father's evaluator.

{¶25} Mother obtained P.R.'s ADHD medication in April 2021, after Father's second evaluation confirmed P.R.'s October 2020 diagnosis. Father agreed to provide P.R. the medication as prescribed. However, P.R. had a counseling session with his behavioral therapist and Father admitted that he did not give P.R. his ADHD medication before the appointment. Father testified he did not give P.R. the medication because he

wanted the therapist to understand P.R.'s baseline and his behaviors. (T. 318). Father did not discuss his plan with Mother before the appointment. (T. 319).

Communication Issues

{¶26} Mother and Father agreed that they had not verbally communicated with each other since March or April 2020. The parties communicated through OFW, email, or text.

{¶27} There was one incident where Father forgot it was his scheduled night to pick up a child from school. Mother picked up the child after the school called and brought him to Mother's home. Father picked up the other child and brought him to Mother's home. Mother stood outside Father's car to speak with him after the child left the vehicle, but Father would not speak with Mother because he was on the phone. Father said Mother did not wait for him to get off the phone. He emailed her through the OFW, acknowledging he had made a mistake about the schedule.

{¶28} When Father dropped the children off at Mother's house, he parked on the street and the children walked independently to Mother's house.

{¶29} Father and Mother agreed the children should be enrolled in sports activities. Father enrolled the children in activities without consulting Mother about the schedule, resulting in difficulties for Mother to get the children to activities because they were scheduled at the same time in different locations.

{¶30} Mother and Father disagreed on a dental treatment for P.R. P.R. required dental work but was afraid of the dentist. The dentist recommended sedation to complete the dental procedure. Father refused to permit the dentist to sedate P.R. Father

rescheduled the appointment and reported to Mother the procedure went smoothly. Mother learned the dentist was not able to complete the procedure as planned.

{¶31} There was an incident where Mother and Father stayed at the medical facility after one of P.R.'s medical appointments. They were discussing the appointment and the discussion became heated to the point a security officer was called to check on the parties.

{¶32} At the time of the hearing, Father testified that he was working with a parenting coach and had four sessions with a mental health counselor but did not have a mental health diagnosis. Mother also reported seeing a counselor due to the divorce but did not have a mental health diagnosis.

Child Support

{¶33} At the time of the hearing, Father was 43 years old. He was employed as an office manager and recruiter for a business in Granville, Ohio. In 2020, Father became a salary plus commission employee after being only a commission employee. He was paid twice a month. According to Father's 2020 W-2, he earned $36,452.99 in gross wages. Father earned a commission through June 15, 2021 in the amount of $18,580.20. His total gross wages through June 15, 2021 were $36,076.20. His other source of income was a rental property. In 2020, Father received $11,150 in rent but paid expenses in the amount of $3,758. Father also sold items on eBay, which he argued was a hobby not a business.

{¶34} Mother was also 43 years old. She was employed as a pharmaceutical representative, with a flexible working schedule. Her bi-weekly pay rate in 2021 was

$5,458.92. Mother was responsible for the health, dental, and vision insurance for the children.

### GAL Report

{¶35} The GAL filed her report on July 2, 2021. She recommended it was in the best interests of the children that the trial court terminate the shared parenting plan and name Mother as the sole residential parent and legal custodian of the children.

### *Bruns* or *Fisher*

{¶36} At the conclusion of the hearing, the magistrate requested the parties to brief the issue of whether the trial court was required to consider a change in circumstances when ruling on Mother's motion for reallocation of parental rights.

{¶37} On August 13, 2021, Mother filed her brief arguing that pursuant to *Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, 168 N.E.3d 396, the trial court was not required to consider a change in circumstances when terminating a shared parenting decree, which included the shared parenting plan, as Mother had requested in this case. The trial court was only required to consider the best interests of the children. Father filed his memorandum on August 23, 2021, arguing that *Bruns* did not overrule *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, which required the trial court to consider a change in circumstances when modifying a shared parenting plan. Father argued that by requesting the trial court name Mother a sole residential parent and legal custodian of the children, she was requesting a modification of the shared parenting plan.

**Magistrate's Decision**

{¶38} On October 12, 2021, the magistrate issued the Magistrate's Decision terminating the shared parenting decree. The magistrate found that Mother had requested the trial court terminate the shared parenting decree, which included the shared parenting plan, thereby placing the matter under the purview of *Bruns* and requiring the court to only consider the best interests of the children. The magistrate found based on the parties' failure to communicate, especially to the detriment of P.R.'s medical needs, it was in the best interests of the children to terminate the shared parenting decree and name Mother as the sole residential parent and legal custodian of the children. The magistrate further recommended there was a change of circumstances necessitating the termination of the shared parenting plan. The magistrate ordered parenting time to the schedule agreed to by the parties in the May 26, 2021 Agreed Magistrate's Order. The magistrate next recommended that Father pay child support in the amount of $581.19 per month, after granting a downward deviation.

{¶39} The trial court approved and adopted the Magistrate's Decision on October 12, 2021.

**Father's Objections**

{¶40} Father filed multiple objections to the Magistrate's Decision. He first argued it was error for the magistrate to follow *Bruns* instead of *Fisher*. He next argued there was no change of circumstances in the parties' relationship when they entered into the shared parenting plan because the parties never got along and never communicated well. Finally, Father challenged the magistrate's calculation of his child support obligation and the start date of his child support obligation.

{¶41} On February 8, 2022, the trial court issued its judgment entry overruling all but two of Father's objections to the Magistrate's Decision. The trial court followed *Bruns* to find that a change in circumstances analysis was not necessary because Mother requested the trial court to terminate the shared parenting decree, which included the shared parenting plan. The trial court sustained Father's objections as to a clerical error and to order that both Mother and Father were required to follow the physician's orders as to the administration of medication for the children.

{¶42} It is from this judgment that Father now appeals.

## ASSIGNMENTS OF ERROR

{¶43} In Father's appellate brief, he lists two Assignments of Error in the "Table of Contents." In his "Statement of Assignment(s) of Error," Father lists 15 Assignments of Error. Pursuant to App.R. 16(A)(3), "the appellant shall include in its brief * * * a statement of the assignment of error presented for review, with reference to the place in the record where each error is reflected." We recite the 15 Assignments of Error listed in Father's statement:

{¶44} "I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT ENTERED AN ORDER REALLOCATING PARENTAL RIGHTS AND RESPONSIBILITIES. [First Assignment of Error in the Table of Contents.]

{¶45} "II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT IT WAS NOT NECESSARY FOR APPELLEE TO PROVE A CHANGE OF CIRCUMSTANCES HAD OCCURRED IN ORDER TO TERMINATE SHARED PARENTING FOR THE PARTIES.

{¶46} "III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FINDING CHANGED CIRCUMSTANCES.

{¶47} "IV. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT IT WAS IN THE BEST INTERESTS OF THE CHILDREN TO TERMINATE SHARED PARENTING AND DESIGNATE APPELLEE AS RESIDENTIAL PARENT AND LEGAL CUSTODIAN.

{¶48} "V. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT REFUSED TO ENGAGE IN THE PROCESS OF NEGOTIATING AN ADHD EVALUATION WITH APPELLEE.

{¶49} "VI. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT FAILED TO ADDRESS THE ISSUE OF P.R.'S MEDICATION IN A TIMELY MANNER.

{¶50} "VII. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT WAS UNABLE OR UNWILLING TO BE FLEXIBLE WITH THE PARENTING TIME SCHEDULE.

{¶51} "VIII. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT THE PARTIES STRUGGLED TO MAKE JOINT DECISIONS.

{¶52} "IX. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT PARTY COMMUNICATION WAS ALMOST NON-EXISTENT.

{¶53} "X. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ATTRIBUTING CREDIBILITY TO THE FINDINGS AND RECOMMENDATIONS OF THE GUARDIAN AD LITEM.

{¶54} "XI. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ENTERING ORDERS FOR CHILD SUPPORT. [Second Assignment of Error in the Table of Contents.]

{¶55} "XII. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT SHALL PAY CHILD SUPPORT TO APPELLEE.

{¶56} "XIII. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT'S ANNUAL COMMISSION INCOME WAS $40,538.64.

{¶57} "XIV. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT A DEVIATION FOR EQUAL PARENTING TIME WAS VALUED AT $134.05 PER MONTH.

{¶58} "XV. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THAT APPELLANT'S CHILD SUPPORT OBLIGATION SHALL BE EFFECTIVE JANUARY 13, 2021.

## ANALYSIS

### I. Termination of the Shared Parenting Plan and Decree

{¶59} In his first through tenth Assignments of Error, Father contends the trial court erred in terminating the shared parenting plan and decree and naming Mother as the sole residential parent and legal custodian of the minor children. We disagree.

### *Bruns* or *Fisher*

{¶60} In his second Assignment of Error, Father contends the trial court erred when it relied upon *Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, 168 N.E.3d 396, to find it was required to consider only the best interests of the minor children before

terminating a shared parenting plan and decree and designating one parent as the residential parent and legal custodian. He contends the trial court should have utilized *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546.

{¶61} In *Bruns*, the Supreme Court considered R.C. 3109.04, which governs the process for allocating parental rights and responsibilities between the parents of minor children. The parents in *Bruns* asked the trial court to terminate their shared parenting plan under R.C. 3109.04(E)(2)(c), or in the alternative, to modify the plan. The trial court terminated the shared parenting plan and found it was in the best interest of the child to name mother as the sole residential parent and legal custodian. On appeal to the Tenth District, the court affirmed that a change of circumstances analysis was not required in order to issue a modified decree allocating parental rights and responsibilities to a single parent, after a prior shared parenting plan had been terminated. *Id.* at ¶ 5.

{¶62} The *Bruns* appeal was certified for a conflict with this Court's decision in *Wright v. Wright*, 5th Dist. Stark No. 2011CA00129, 2012-Ohio-1560, where we held that a change of circumstances analysis was necessary for the modification of the designation of a residential parent and legal custodian following the termination of a shared parenting plan. *Id.* at ¶ 6. The Supreme Court was asked whether the termination of a shared parenting plan and decree and subsequent modification of parental rights and responsibilities under R.C. 3109.04(E)(2) required first a finding of a change in circumstances under R.C. 3109.04(E)(1)(a). *Id.*

{¶63} The Supreme Court found that while subsection R.C. 3109.04(E)(1)(a) outlined how to modify a custody decree, and subsections (E)(2)(a) and (b) outlined how

to modify the terms of a shared parenting plan, it was subsection (E)(2)(c) that provided the procedures for terminating a shared parenting plan. The statute reads:

> The court may terminate a prior final shared parenting decree that includes a shared parenting plan * * * upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children.

{¶64} The Court then stated, "[i]n the event that the court terminates a shared-parenting decree, R.C. 3109.04(E)(2)(d) provides:

> Upon the termination of a prior final shared parenting decree under division (E)(2)(c) of this section, the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of this section *as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made.*

(Emphasis sic.) *Bruns*, ¶ 12-13. Accordingly, under the plain language of R.C. 3109.04, the *Bruns* Court held that a trial court is not required to find a change in circumstances, in addition to considering the best interest of the child, before terminating a shared parenting plan and decree and designating one parent as the residential parent and legal custodian. *Id.* at ¶ 21.

{¶65} In so ruling, the Court explained its conflicting decision in *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, where it held that a modification of the designation of a residential parent and legal custodian of a child requires that a change of circumstances has occurred, as well as finding that the

modification is in the best interests of the child. *Id.* at ¶ 15. In *Fisher*, both parents requested a termination of the shared parenting plan, which the trial court granted and found it was in the best interest of the child for mother to be named the residential parent and legal custodian. On appeal, the Third District construed the trial court's actions as a modification of a shared parenting plan, not a termination of shared parenting plan, but found the trial court was not required to consider a change of circumstances under R.C. 3109.04(E)(1)(a). *Id.* at ¶ 17. The matter was certified for a conflict and the issue presented to the Supreme Court was whether a change in the designation of the residential parent and legal custodian was simply a "term" of the shared parenting plan, thereby allowing the designation to be modified solely on the consideration of the best interest of the child, not whether there was a change of circumstances. *Id.* at ¶ 18. Based on the parties' and appellate court's interpretation of the trial court's decision as a *modification* not a *termination* of a shared parenting plan, the Supreme Court answered the question in the negative. It found the trial court was required to utilize a change of circumstances analysis. *Id.* at ¶ 19-20.

{¶66} In her concurring opinion, Justice Kennedy explained the Court's decision:

*Fisher* involved the termination of a decree and plan of shared parenting, and in its decision, this court erred by applying the statutory provision that controls the modification of the allocation of parental rights and responsibilities of a decree and plan of shared parenting, R.C. 3109.04(E)(1)(a), to a termination case. That is, *Fisher* treated a termination of a decree and plan of shared parenting like it was a modification of

parental rights and responsibilities contained within a decree and plan of shared parenting.

*Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, 168 N.E.3d 396, ¶ 22.

{¶67} Justice Kennedy further clarified:

Therefore, once a trial court has granted an original decree and plan of shared parenting, the central question a trial court faces at the outset of postdecree litigation is whether the parties are seeking to modify the decree and plan of shared parenting or terminate the decree and plan of shared parenting. The answer to that question drives which statute applies.

*Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, 168 N.E.3d 396, ¶ 27.

{¶68} In this case, we agree with Father that the facts are essentially identical to those in *Bruns* and *Fisher*; however, *Bruns* controls. The record shows there is no dispute that Mother sought a termination of the shared parenting plan and decree and to issue a custody order that she would be named the sole residential parent and legal custodian. Pursuant to *Bruns*, a trial court must consider a termination under the standard set forth in R.C. 3109.04(E)(2)(c). We find no error for the trial court to consider only the best interest of the child when deciding whether to terminate the shared parenting plan and decree to which parent to designate as the residential and custodial parent of the minor child.

### Best Interests

{¶69} Our standard of review in assessing the disposition of child custody matters is that of abuse of discretion. *DiDonato v. DiDonato*, 5th Dist. Tuscarawas No. 2015 AP 07 0042, 2016-Ohio-1511, 63 N.E.3d 660, ¶ 44, quoting *Miller v. Miller*, 37 Ohio St.3d 71,

523 N.E.2d 846 (1988). In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Furthermore, as an appellate court reviewing evidence in custody matters, we do not function as fact finders; we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *Id.*, quoting *Dinger v. Dinger*, 5th Dist. Stark No. 2001 CA 00039, 2001-Ohio-1386, 2001 WL 1141268.

{¶70} The trial court is "best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Deferential review in a child custody determination is especially crucial "where there may be much evidence by the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159 (1997). We are mindful that the knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record, and the reviewing court should be guided by the presumption that the trial court's findings were correct. *See Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶71} The trial court must weigh the best interest of the children before terminating a shared parenting decree.[1] R.C. 3109.04(E)(2)(c). R.C. 3109.04(F), which sets forth the factors a trial court must consider in determining the best interest of the child, provides:

---

[1] Based on *Bruns*, we do not consider the issue of change of circumstances.

(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense

involving any act that resulted in a child being an abused child or a neglected child * * *;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

(F)(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

{¶72} The Magistrate's Decision and trial court's judgment entry overruling Father's objections to the Magistrate's Decision thoroughly and independently examined the record and the best interest considerations under R.C. 3109.04(F). The most weighing factor in this case as to whether it was in the best interest of the children to terminate the shared parenting plan was found in R.C. 3109.04(F)(2)(a), the ability of the parents to cooperate and make decisions jointly, with respect to the children. The parties started with a shared parenting plan, but the evidence demonstrated that when it came to making an important medical decision for P.R. after the inception of the shared parenting plan, the parties could not cooperate and make decisions jointly. In 2020, medical and educational professionals recommended to Mother and Father that P.R. be evaluated to determine if he suffered from any additional challenges so that he could receive the appropriate medical and educational attention. The OFW communications between Mother, Father, and the parenting coordinator showed that after being presented with the professional recommendations, Father refused to allow P.R. even to be evaluated, which did not require the administration of any medication. Father blamed Mother's parenting for P.R.'s learning and behavioral challenges. After the parenting coordinator's intercession confirming the professional recommendations, Father conceded to P.R.'s evaluation by a mental health professional (but he would not participate in the evaluation), which determined P.R. had ADHD in addition to his other learning difficulties. It was not until 2021 and after Father's own evaluator confirmed the 2020 diagnosis of ADHD that Father permitted his child be prescribed medication to assist with his mental health needs.

{¶73} The magistrate and trial court noted that P.R.'s medical issue was an example of the larger communication difficulties between Mother and Father. Both parties

testified they had not verbally spoken to each other since March or April 2020. Father enrolled the children in sporting activities without consulting Mother about the schedule when she would be involved in getting the children to and from the events. Father would not exit the vehicle when he dropped off the children at Mother's home. After a confusion in the parenting time schedule, Father would not respond to Mother's phone calls or speak to her when she was standing at his car window. In one of his text messages to Mother in regard to the children, he called her, "bitch."

{¶74} The GAL recommended the termination of the shared parenting plan. Father argues on appeal that the trial court gave improper weight to the GAL's findings and recommendations. The trial court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to consider it in the context of all the evidence before the court. *In re K.A.*, 5th Dist. Fairfield No. 2021 CA 00004, 2021-Ohio-1773, ¶ 48, citing *In the Matter of D.S.*, 5th Dist. Fairfield No. 15 CA 30, 2016-Ohio-79. The GAL testified at the hearing where Father's counsel had the opportunity to cross examine the GAL. Father did not object to the admission of the GAL's report.

{¶75} At the hearing, Father testified that Mother and Father were able to eventually agree on issues, as evidenced by the shared parenting plan and P.R.'s treatment plan. The trial court noted that Father's interpretation of "agreement" was more akin to Mother's acquiescence to Father. The magistrate was in the best position to assess the credibility of Father and Mother when they testified at the hearing. In this case, the magistrate found Mother to be more credible than Father as to their inability to agree and work jointly for the benefit of the children. Upon this record, we find the trial court did not abuse its discretion to find it was in the best interest of the children to terminate the

shared parenting plan and decree and name Mother as the sole residential parent and legal custodian of the children.

{¶76} Father's Assignments of Error related to the issue of the termination of the shared parenting plan and decree are overruled.

## II. Child Support

{¶77} In his eleventh through fifteenth Assignments of Error, Father contends the trial court erred as to the award of child support.

{¶78} The abuse-of-discretion standard is the appropriate standard of review in matters concerning child support. *Kiehborth v. Kiehborth*, 169 Ohio App.3d 308, 2006-Ohio-5529, 862 N.E.2d 863, ¶ 21 (5th Dist.), citing *Booth v. Booth*, 44 Ohio St.3d 142, 541 N.E.2d 1028 (1989). In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶79} Father first argues that he should not be obligated to pay child support. In the shared parenting plan and decree, Mother was obligated to pay child support in the amount of $1,130.72 per month. After the termination of the shared parenting plan and decree, Father was ordered to pay child support in the amount of $581.19 per month, after a downward deviation. Father contends that although Mother was named the sole residential parent and legal custodian, the modest modification of the parenting time schedule should not warrant an increase in child support to $1,711.91 per month ($1,130.72 + $581.19). Father appears to argue that there is still a shared parenting like-plan in place; therefore, he should not be obligated to pay child support because Mother was obligated to pay child support under the now-terminated shared parenting plan.

{¶80} Pursuant to R.C. 3119.07(A), the trial court did not agree with Father's basic premise that he should not be obligated to pay child support. R.C. 3119.07(A) reads, "Except when the parents have split parental rights and responsibilities, a parent's child support obligation for a child for whom the parent is the residential parent and legal custodian shall be presumed to be spent on that child and shall not become part of a child support order, and a parent's child support obligation for a child for whom the parent is not the residential parent and legal custodian shall become part of a child support order." It is under R.C. 3119.02 that the trial court calculates "the amount of the parents' child support and cash medical support in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119. of the Revised Code." In this case, there is no shared parenting plan and Mother is named the sole residential parent and legal custodian. Father is not the residential parent and legal custodian. The trial court is obligated to calculate the amount of child support pursuant to R.C. 3119.02.

Calculation of Child Support

{¶81} Father next argues the trial court erred in its calculation of child support, specifically as to the Father's commission income and the determination of the deviation. Several statutory provisions govern the calculation of child support. R.C. 3119.03 establishes a rebuttable presumption that the child support amount calculated using the statutory schedule and worksheet is the correct amount of child support:

> In any action or proceeding in which the court determines the amount of
>
> child support that will be ordered to be paid pursuant to a child support order
>
> * * * the amount of child support that would be payable under a child support

order, as calculated pursuant to the basic child support schedule and applicable worksheet through the line establishing the actual annual obligation, is rebuttably presumed to be the correct amount of child support due.

### Commission Income

{¶82} Father testified at the hearing that he earned a salary and a commission, for which he was paid semi-monthly, on the 15th and 30th of the month. He started at his position in 2019 and he did not begin earning a commission until June 2020. His base salary was $1,458.00 semi-monthly, equaling $34,992.00 per year. The total commissions earned year to date through June 15, 2021 was $18,580.22. His gross earnings through June 15, 2021 were $36,076.20. The magistrate prorated Father's commission based on the estimated number of pay periods and found that Father's semi-monthly commission income was $1,689.11 for support calculation purposes, which totaled $40,538.64 per year.

{¶83} In his objections and on appeal, Father argues that pursuant to the language of R.C. 3119.05(D), the trial court was not permitted to include Father's commission income in the child support calculation. R.C. 3119.05(D) states:

(D) When the court or agency calculates the annual income of a parent, it shall include the lesser of the following as income from overtime and bonuses:

(1) The yearly average of all overtime, commissions, and bonuses received during the three years immediately prior to the time when the person's child support obligation is being computed;

(2) The total overtime, commissions, and bonuses received during the year immediately prior to the time when the person's child support obligation is being computed.

{¶84} When confronted with income earned through overtime, bonuses, and commissions, R.C. 3119.05(D) instructs the court to use the lesser of the following two figures: "[t]he yearly average of all overtime, commissions, and bonuses received during the three years immediately prior," R.C. 3119.05(D)(1), or "[t]he total overtime, commissions, and bonuses received during the year immediately prior," R.C. 3119.05(D)(2). The court must follow the statutory directives for calculating gross income before determining the appropriate child-support award based on that income. *A.S. v. J.W.*, 157 Ohio St.3d 47, 2019-Ohio-2473, 131 N.E.3d 44, 2019 WL 2587857

{¶85} Father states there was no evidence presented of Father's commission from three years immediately prior to the time when his child support obligation was being computed (2018-2020) nor was there evidence presented of Father's commission income received during the year immediately prior to the time when Father's child support obligation was being computed (2020). Father contends his testimony showed he started his current employment in 2019 and began earning a commission in June 2020. Evidence of his commission earnings from January 1, 2021 through June 15, 2021 was presented at trial through Father's pay stub (Plaintiff's Exhibit 4). The trial court completed the child support worksheet on October 12, 2021. Father argues the trial court could not to estimate his commission income under R.C. 3119.05(D) for child support calculation purposes.

{¶86} The trial court rejected Father's argument and found the magistrate did not err when she averaged Father's commissions for the duration Father earned the

commissions to determine Father's annual income. Pursuant to *A.S. v. J.W.*, 157 Ohio St.3d 47, 2019-Ohio-2473, 131 N.E.3d 44, 2019 WL 2587857, we disagree.[2]

{¶87} In *A.S. v. J.W.*, the trial court averaged the father-obligor's commissions received during 2014 and 2015 and his projected commissions for 2016. It then added that figure to father-obligor's 2016 salary to determine father-obligor's total gross income for 2016. The Supreme Court held the plain language of R.C. 3119.05(D)(1) directs the trial court to use the average of the commissions earned during the three years prior to the time that the child-support obligation is being computed. The Supreme Court found, "the magistrate deviated from the mandate of R.C. 3119.05(D)(1) by using the current year's projected commissions when calculating the average commissions to be included in Father's total annual gross income. Instead, the court should have used the average of the commissions earned during 2013, 2014, and 2015, or the commissions earned in 2015, whichever is lower. R.C. 3119.05(D)." *Id.* at ¶ 21.

{¶88} The trial court in this case utilized Father's current year commission earnings to calculate the average commissions to be included in Father's total annual gross income for child support calculation purposes, which is in contravention of the plain language of R.C. 3119.05(D). *See A.S. v. J.W.*, 2019-Ohio-2473.

{¶89} We hereby sustain Father's Assignment of Error as to the calculation of Father's commission under R.C. 3119.05(D). The matter is remanded to the trial court for further proceedings consistent with this Opinion and law.

---

[2] Effective March 28, 2019, R.C. Chapter 3119 was amended by 2018 Am.Sub.H.B. 366. *A.S. v. J.W.* interprets and applies the version of R.C. Chapter 3119 applicable prior to H.B. 366's recent amendments. However, the language of R.C. 3119.05(D) is identical in the prior and current versions of R.C. Chapter 3119.

<u>Deviation</u>

{¶90} Father next contends the trial court erred and abused its discretion by concluding a deviation for equal parenting time was valued at $134.05 per month. The Magistrate's Decision provided Father with an adjustment of 10% to his support obligation as a result of exercising parenting time in excess of 90 over nights per year. The Magistrate's Decision next recommended a deviation based on Father's extended parenting time under R.C. 3119.23(C). The Magistrate's Decision stated,

> The parents have equal time with the children. Accordingly, Father exercises parenting time which exceeds 147 overnights per year. The Father is, therefore, entitled to a deviation for such parenting time. R.C. 3119.231. The Magistrate values such a deviation at $134.05 per month. The Magistrate finds that guildeline support would be unjust or inappropriate and would not be in the best interest of the children.

(Magistrate's Decision, October 12, 2021).

{¶91} When issuing an order of child support, the trial court must calculate the amount of support "in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119." R.C. 3119.02. The child support amount that results from the use of the basic worksheet is presumed to be the correct amount of child support due. R.C. 3119.03. However, under R.C. 3119.22, a court may deviate from the guideline amount of child support, if, after consideration of the factors set forth in R.C. 3119.23, the court determines that the guideline amount "would be unjust or inappropriate and therefore not in the best interest of the child." R.C. 3119.22. The trial court is vested with the discretion to determine when and whether to grant a deviation

from the guideline child support amount. *Caleshu v. Caleshu*, 10th Dist. Franklin No. 19AP-742, 2020-Ohio-4075; *Bible v. Bible*, 5th Dist. Coshocton No. 2018CA0001, 2018-Ohio-5147.

{¶92} R.C. 3119.231(A) provides that "if court-ordered parenting time exceeds ninety overnights per year, the court shall consider whether to grant a deviation pursuant to R.C. 3119.22 of the Revised Code for the reason set forth in division (C) of section 3119.23 of the Revised Code. This deviation is in addition to any adjustments provided under division (A) of section 3119.051 of the Revised Code."

{¶93} R.C. 3119.051(A) states as follows:

Except as otherwise provided in this section, a court or child support enforcement agency calculating the amount to be paid under a child support order shall reduce by ten percent the amount of the annual individual support obligation for the parent or parents when a court has issued or is issuing a court-ordered parenting time order that equals or exceeds ninety overnights per year. This reduction may be in addition to the other deviations and reductions.

{¶94} In this case, Father is entitled to an automatic 10% deviation because he has more than 90 overnights visits with the children. R.C. 3119.50(A); *Glover v. Canann*, 11th Dist. Trumbull No. 2020-T-0081, 2021-Ohio-2641. If the obligor enjoys more than 147 overnights per year, as Father does here, the guidelines provide that the court will consider a deviation in addition to the R.C. 3119.051 deviation. R.C. 3119.231(B). In reviewing whether a deviation is appropriate, the trial court considers whether the calculated amount is inappropriate or unjust and not in the best interests of the child by

applying the relevant factors contained in R.C. 3119.23, and, in the case of shared parenting, consider any extraordinary circumstances of the parents or other factors contained in R.C. 3119.23. R.C. 3119.24; *Glover v. Canann*, 11th Dist. Trumbull No. 2020-T-0081, 2021-Ohio-2641. *Getreu v. Getreu*, 5th Dist. Licking No. 2020 CA 00083, 2021-Ohio-2761, 2021 WL 3524063, ¶¶ 48-51.

{¶95} Father contends this case is identical to the fact pattern of *Getreu v. Getreu,* 5th Dist. Licking No. 2020 CA 00083, 2021-Ohio-2761, 2021 WL 3524063, where we reversed and remanded a trial court's calculation of a downward deviation because the court failed to discuss its basis for the deviation so that we could conduct a meaningful review. The record in *Getreu* showed that the father-obligor enjoyed more than 147 overnights per year, but the trial court did not state that factor in its judgment entry or on the record. The record in the case showed:

> Pursuant to the child support worksheet, Father's annual support obligation without deviation was $10,173 per year. This amount was reduced by the R.C. 3119.051 automatic 10% deviation of $1,017.30 in lines 19-22 of the worksheet, leaving an adjusted child support obligation of $9,155.70 per year, or $762.98 per month. The court then granted an additional deviation on line 25a of the child support worksheet, reducing Father's support obligation by $76.29 per month. In the judgment entry, the trial court found the additional deviation was "just, appropriate, and in the child's best interest and the reason for the deviation is the extended parenting time and support provided by Father."

*Getreu v. Getreu,* 5th Dist. Licking No. 2020 CA 00083, 2021-Ohio-2761, 2021 WL 3524063, ¶ 52. We reversed the trial court's calculation of a 10% downward deviation in the father's child support obligation, in addition to the standard 10% deviation for 90 overnight visits, because the trial court failed to discuss the factors and/or extraordinary circumstances in the record or judgment entry so that this Court could conduct a meaningful review. *Id.* at ¶ 55.

{¶96} In this case, the Magistrate's Decision states, "The parents have equal time with the children. Accordingly, Father exercises parenting time which exceeds 147 overnights per year." (Magistrate's Decision, October 12, 2021). The magistrate found that a 10% deviation plus an 8% downward deviation was recommended based on Father's equal time with the children, in excess of 147 overnights per year. We find that unlike *Getreu*, the trial court stated the factor it considered in awarding Father an additional 8% downward deviation so that we could conduct a meaningful review. Based on our abuse of discretion standard of review, we find no error.

Child Support Effective Date

{¶97} In his final Assignment of Error, Father contends the trial court erred when it found the effective date of child support should be January 13, 2021, when service of Mother's motion for reallocation of parental rights and responsibilities was served on Father. Father argues the child support obligation should be effective on October 12, 2021, when the trial court terminated the shared parenting plan and decree and modified the child support obligation.

{¶98} In her appellate brief, Mother does not concede to Father's argument, but in an act of "grace and mercy," states the effective date of Father's child support obligation

should be July 29, 2021. While this Court appreciates the spirit of conciliation, appellate briefing is not the appropriate venue for the parties' negotiations. Further, Mother did not raise this argument to the trial court and therefore cannot be considered by this Court on appeal.

{¶99} Generally, the choice of the effective date for payment of a modified child support obligation is left to the discretion of the trial court. *Nichols v. Nichols*, 10th Dist. No. 13AP–13, 2013–Ohio–3927, ¶ 20; *O'Brien v. O'Brien*, 10th Dist. No. 07AP–313, 2007–Ohio–5448, ¶ 10. Trial courts most often make modifications of child support effective from the date the motion for modification was filed. *Mayberry v. Mayberry*, 10th Dist. Franklin No. 15AP-160, 2016-Ohio-1031, 2016 WL 1034928, ¶ 38; *Baxter v. Thomas*, 8th Dist. No. 101186, 2015–Ohio–2148, ¶ 36; Nichols at ¶ 20; *Sandel v. Choma*, 9th Dist. No. 25995, 2012–Ohio–3781, ¶ 5; *In re P.J.H.*, 196 Ohio App.3d 122, 2011–Ohio–5970, ¶ 12 (2d Dist.); *Meyer v. Meyer*, 4th Dist. No.2006CA00145, 2008–Ohio–436, ¶ 38; *Maynard v. Landon*, 5th Dist. Morrow No. 2006-CA-0015, 2007-Ohio-2813, ¶ 10; *In re Smith*, 11th Dist. No. 2005–A–0048, 2007–Ohio–893, ¶ 76. This Court found absent special circumstances, a trial court should make the modified child support retroactive to the date the parties received notice of the request for modification, because this makes decisions regarding the effective date of child support modification consistent, predictable, and fair. *Maynard v. Landon*, 5th Dist. Morrow No. 2006-CA-0015, 2007-Ohio-2813, 2007 WL 1651986, ¶ 10.

{¶100} "Alternatively, a trial court may choose an effective date subsequent to the filing of the motion for modification if such a date bears significance in relation to the grounds for the modification and the court explains its reasoning for selecting the

date." *Mayberry v. Mayberry*, 10th Dist. Franklin No. 15AP-160, 2016-Ohio-1031, 2016 WL 1034928, ¶ 38. This Court has held a trial court may order a child support modification retroactive to the date the shared parenting agreement terminated. *McNeeley v. Ortiz*, 5th Dist. Stark No. 2010-CA-00012, 2010-Ohio-4650, 2010 WL 3784435, ¶ 22 citing *Kemp v. Kemp,* 5th Dist. Stark No. 2009-CA-00035, 2009-Ohio-6089.

{¶101} In this case, the Magistrate's Decision relied upon *Maynard* to set the effective date of Father's child support obligation to January 13, 2021, when service of Mother's motion for reallocation was perfected on Father via certified mail. We cannot find the trial court abused its discretion in following the general rule regarding effective dates. Father sets forth multiple reasons justifying October 12, 2021 as the effective date, but his reasons do not render the selection of the January 13, 2021 date as unreasonable, arbitrary, or unconscionable. We find no abuse of discretion.

{¶102} Father's Assignments of Error as to the determination of child support are sustained in part and overruled in part. The matter is remanded to the trial court for further proceedings pursuant to this Opinion and law.

**CONCLUSION**

{¶103}     The judgment of the Licking County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed and remanded in part.

By:  Delaney, J.,

Wise, Earle, P.J. and

Baldwin, J., concur.